McGEE, Chief Judge.
 

 *18
 
 I.
 

 Richard Dixon Peacock ("Decedent") and Bernadine Peacock ("Petitioner") were married 1 August 1993. Decedent had two children by a prior marriage, Rachel Peacock Ceci ("Rachel") and Richard Eric Peacock ("Eric"). Decedent and Petitioner had three children: two living at the time of this action, Richard Peacock II ("Richard") and Kristen
 
 *19
 
 Alicia Peacock ("Kristen"); and Jonathan Peacock, deceased and without heirs. Decedent and Petitioner divorced in 2007. The uncontested testimony is that Decedent and Petitioner reconciled, and Petitioner moved back into Decedent's house in July 2012. They attended church "every Sunday with Richard, and established a relationship with their pastor, Reverend Dena Bearl ("Reverend Bearl"). Reverend Bearl first assumed Decedent and Petitioner were married, but they informed her they had divorced and reconciled, and that they intended to remarry, but "never made a solid date." According to Reverend Bearl, Decedent and Petitioner "just said they wanted to do it, and I said, you know, give me a call and we'll get together and discuss it. And, you know, just he got ill and we-they just-we never had that meeting that they wanted to have."
 

 Decedent had chronic medical issues, and Petitioner cared for him. Decedent became ill on 16 November 2013, and required hospitalization. Decedent was twice transferred from the hospital to a rehabilitation facility before returning to the hospital on 14 December 2013. Decedent and Petitioner discussed marriage while Decedent was hospitalized, and decided to marry while Decedent was still in the hospital. Petitioner asked their friend, Mary Bridges "to be ... her 'maid of honor' as a witness and [Petitioner's] son, Richard, as a best man [and the second witness]." Reverend Bearl visited Decedent in the hospital about every other day, and she agreed to officiate the wedding ceremony at Decedent's and Petitioner's request. Reverend
 
 *193
 
 Bearl testified she had been ordained for twenty-two years, had performed many wedding ceremonies in her capacity as a pastor, and was fully authorized by her church to do so. Reverend Bearl testified she performed the regular ceremony that she performs for weddings, though certain parts were shortened. Reverend Bearl testified both Decedent and Petitioner affirmed: "In the name of God, I take you to be my wife[/husband], to have and to hold from this day forward, for better, for worse, richer or poorer, in sickness, in health, to love and to cherish until death[.]" Reverend Bearl then "pronounce[d] [Decedent and Petitioner] husband and wife[,]" and performed "the blessing of the marriage" which, Reverend Bearl testified, "for us [her church] is very important."
 

 However, because Decedent and Petitioner had not procured a marriage license, Reverend Bearl testified:
 

 It was my intent to provide what I thought was for Richard in the last days of his life some closure to something that he felt and regretted had not been done. So, it was
 
 *20
 
 a pastoral act on my part. I knew there wasn't a wedding license. I wasn't in there as a representative of the state, which clergy are, you know, when they're doing marriages and have the license present. So, I mean, we all knew that there was not a wedding, a marriage license. So, this was a pastoral and a sacramental-I would say for me it was mainly a sacramental act, a sacrament that they wanted to know that they had.
 

 Q. When you left the room, did you feel that they were now husband and wife?
 

 A. I felt that they felt that they were, that they had taken the vows seriously.
 

 ....
 

 Q. Did you discuss with them whether they-you could legally marry them?
 

 A. I-well, I told them that it would not be a legal marriage if we didn't have a license, and they did not have a license. But I believe the sacrament took place, and that was what was important to them.
 

 Petitioner testified that she did not attempt to obtain a marriage license because Decedent was too ill to travel to the register of deeds, and that "we didn't really think about a marriage license, we just were happy to finally get married."
 

 Decedent died intestate on 19 December 2013, the day following the ceremony. Rachel filed an application for letters of administration on 17 April 2014, in which she listed four known heirs: herself, Eric, Richard and Kristen. Petitioner filed a motion for determination of heirs dated 16 October 2014, contending she was the spouse of Decedent when he died and, therefore, she should be included as an heir of Decedent's estate. This matter was initially heard by an Assistant Clerk of Court of New Hanover County on 11 December 2014. The Assistant Clerk of Court concluded that the 18 December 2013 ceremony did "not make [Petitioner] an 'heir' or entitle [Petitioner] to a spousal allowance or the share of the surviving spouse or any other interest in or from the Decedent's Estate." The Assistant Clerk of Court ruled that Decedent's heirs were Rachel, Eric, Richard, and Kristen.
 

 Petitioner appealed the decision to superior court. Petitioner's appeal was heard on 7 May 2015, and additional testimony was permitted.
 

 *21
 
 The trial court, in an order entered 26 May 2015, made its own findings of fact and conclusions of law, and affirmed the Assistant Clerk of Court's decision. Petitioner appeals.
 

 II.
 

 Appellate review of orders of clerks of court is as follows:
 

 On appeal to the Superior Court of an order of the Clerk in matters of probate, the trial court judge sits as an appellate court. When the order or judgment appealed from does contain specific findings of fact or conclusions to which an appropriate exception has been taken, the role of the trial judge on appeal is to apply the whole record test. In doing so, the trial judge reviews the Clerk's findings and may either affirm, reverse, or modify them. If there is evidence to support the findings of the Clerk, the judge must affirm. .... The standard of review in this Court is the same as in the Superior Court.
 

 *194
 

 In re Estate of Pate,
 

 119 N.C.App. 400
 
 , 402-03,
 
 459 S.E.2d 1
 
 , 2-3 (1995) (quotations and citations omitted). "Errors of law are reviewed
 
 de novo
 
 ."
 
 Overton v. Camden Cty.,
 

 155 N.C.App. 391
 
 , 393,
 
 574 S.E.2d 157
 
 , 160 (2002) (citation omitted). Though Petitioner argues that certain findings of fact were not supported by the evidence, we have thoroughly reviewed the findings of fact and hold that the relevant findings of fact are supported by the evidence. We therefore review the relevant conclusions of law, and the trial court's ruling,
 
 de novo
 
 for errors of law.
 

 Id.
 

 III.
 

 Petitioner argues that the "[trial] court's judgment is inconsistent with the applicable law." We agree.
 

 The rulings of the Assistant Clerk of Court and the trial court are based upon conclusions that the ceremony conducted on 18 December 2013 did not result in a valid marriage. The "Requisites of marriage" are set forth, in relevant part, in N.C. Gen.Stat. § 51-1 as follows:
 

 A valid and sufficient marriage is created by the consent of a male and female person
 
 [1]
 
 who may lawfully marry,
 
 *22
 
 presently to take each other as husband and wife, freely, seriously and plainly expressed by each in the presence of the other, either:
 

 (1) a. In the presence of an ordained minister of any religious denomination, a minister authorized by a church, or a magistrate; and
 

 b. With the consequent declaration by the minister or magistrate that the persons are husband and wife[.]
 

 N.C. Gen.Stat. § 51-1 (2015). In the present case, it is undisputed that Decedent and Petitioner were able to lawfully marry at the time of the ceremony; that they seriously and freely expressed their desire to become husband and wife in the presence of each other; that Reverend Bearl was an ordained minister with authority to conduct marriage ceremonies; and that Reverend Bearl declared during the ceremony that Decedent and Petitioner were husband and wife.
 

 However, it is also undisputed that the ceremony was conducted without a marriage license as required by N.C. Gen.Stat. § 51-6, which states:
 

 No minister, officer, or any other person authorized to solemnize a marriage under the laws of this State shall perform a ceremony of marriage between a man and woman, or shall declare them to be husband and wife, until there is delivered to that person a license for the marriage of the said persons, signed by the register of deeds of the county in which the marriage license was issued or by a lawful deputy or assistant.
 

 N.C. Gen.Stat. § 51-6 (2015). Violation of N.C. Gen.Stat. § 51-6 by a minister or other authorized person is a misdemeanor, and is punishable by a fine:
 

 Every minister, officer, or any other person authorized to solemnize a marriage under the laws of this State, who marries any couple without a license being first delivered to that person, as required by law, or after the expiration of such license, or who fails to return such license to the register of deeds within 10 days after any marriage celebrated by virtue thereof, with the certificate appended thereto duly filled up and signed, shall forfeit and pay two
 
 *23
 
 hundred dollars ($200.00) to any person who sues therefore, and shall also be guilty of a Class 1 misdemeanor.
 

 N.C. Gen.Stat. § 51-7 (2015).
 

 Our Supreme Court has discussed the consequences of violating the license requirement in N.C. Gen.Stat. § 51-6 :
 

 C.S., 2498,
 
 [2]
 
 emphasizes the requirement that the license must be first delivered to the officer before the solemnization of the marriage:
 

 *195
 
 "No minister or officer shall perform a ceremony of marriage between any two persons, or shall declare them to be man and wife,
 
 until
 
 there is delivered to him a license for the marriage of the said persons, signed by the register of deeds of the county in which the marriage is intended to take place, or by his lawful deputy."
 

 It is true that the marriage is not invalid because solemnized without a marriage license;
 
 Maggett v. Roberts,
 

 112 N.C. 71
 
 ,
 
 16 S.E. 919
 
 ;
 
 State v. Parker,
 

 106 N.C. 711
 
 ,
 
 11 S.E. 517
 
 ;
 
 State v. Robbins,
 

 28 N.C. 23
 
 , [
 
 44 Am. Dec. 64
 
 ],-or under an illegal license;
 
 Maggett v. Roberts, supra
 
 -but it is clear that both these sections of the statute require that the license shall be first delivered to the officer before the marriage is solemnized, else under the latter statute he is liable to the penalty sued for in this action.
 

 Wooley v. Bruton,
 

 184 N.C. 438
 
 , 440,
 
 114 S.E. 628
 
 , 629 (1922).
 
 Wooley
 
 states the principal, well-established in North Carolina jurisprudence, that though violation of N.C. Gen.Stat. § 51-6 might subject a person who officiates a wedding ceremony without first receiving a marriage license to prosecution, the lack of a valid license will not invalidate that ceremony, or the resulting marriage.
 
 Wooley,
 

 184 N.C. at 440
 
 ,
 
 114 S.E. at
 
 629 ;
 
 see also
 

 Sawyer v. Slack,
 

 196 N.C. 697
 
 , 700,
 
 146 S.E. 864
 
 , 865 (1929) (citation omitted) ("It has, however, been uniformly held by this Court that a marriage, without a license as required by statute, is valid.");
 
 Maggett v. Roberts,
 

 112 N.C. 71
 
 , 74,
 
 16 S.E. 919
 
 , 920 (1893) (citations omitted) ("The marriage under an invalid license, or with no license, as has been repeatedly held, would be good, if valid in other respects. The
 
 *24
 
 only effect of marrying a couple without a legal license is to subject the officer or minister to the penalty of $200, prescribed by The Code[.]");
 
 State v. Robbins,
 

 28 N.C. 23
 
 , 25 (1845) ("The law of this State ... authorizes and empowers the clerks of the several county courts to grant marriage licenses, upon the applicant's giving bond and security agreeably to its provisions; but if a marriage is solemnized by a minister of the gospel or a magistrate, without a license, though he may subject himself to a penalty, the marriage is, notwithstanding, good to every intent and purpose.").
 

 Therefore, in order to show a valid marriage,
 

 [ N.C. Gen.Stat. § 51-1 ] require[s] the parties to "express their solemn intent to marry in the presence of (1) an ordained minister of any religious denomination, or (2) a minister authorized by his church or (3) a magistrate."
 

 Our Supreme Court has stated: "[u]pon proof that a marriage ceremony took place, it will be presumed that it was legally performed and resulted in a valid marriage." The burden of proof rests upon plaintiff to prove by the greater weight of the evidence grounds to void or annul the marriage to overcome the presumption of a valid marriage.
 

 Pickard v. Pickard,
 

 176 N.C.App. 193
 
 , 196,
 
 625 S.E.2d 869
 
 , 872 (2006) (citations omitted). A marriage performed in full accordance with N.C. Gen.Stat. § 51-1, but lacking the license required by N.C. Gen.Stat. § 51-6, is valid, and neither void nor voidable.
 
 Sawyer,
 

 196 N.C. at 700
 
 ,
 
 146 S.E. at 865
 
 . This Court must follow the law as written, and follow the precedents set by prior decisions. It is the sole province of the General Assembly to amend the laws to make a marriage license a pre-requisite to a valid marriage.
 

 In the present case, the trial court made the following relevant findings of fact:
 

 13. On or about December 18, 2013, ... Reverend Dena Bearl, Rector of St. Paul's Episcopal Church in Wilmington, North Carolina, conducted a ceremony at the hospital involving Decedent and [Petitioner]. Reverend Bearl performed the "Celebration and Blessing of a Marriage" ... from the Episcopal Book of Common Prayer, which is used in the Episcopal Church to perform marriage ceremonies. However, Reverend Bearl considered this a "religious wedding," and did not intend for this ceremony to be a "legal wedding."
 

 *25
 
 14. Reverend Bearl informed the Decedent and [Petitioner] at the time of the December 18, 2013 ceremony that a marriage license was required for a legal
 
 *196
 
 marriage and that the ceremony she was performing did not constitute a legal marriage.
 

 ....
 

 21. "[Petitioner] intended to participate in the December 18, 2013 ceremony without a marriage license, despite knowing that she needed a marriage license to be married to the Decedent."
 

 Based in part on these findings, the trial court concluded the following:
 

 1. There is insufficient evidence to show that the Petitioner and Decedent attempted to comply, intended to comply, or were unable to comply with North Carolina law requiring a marriage license for a valid, legal marriage.
 

 2. The ceremony performed by Reverend Bearl at the hospital on December 18, 2013, with the Decedent and [Petitioner] was a religious ceremony and not a legal marriage.
 

 3. The heirs of Decedent ... are Rachel Peacock Ceci, Richard Eric Peacock, Richard Dixon Peacock, II, and Kristen Alicia Peacock.
 

 Petitioner argues that our Supreme Court's opinion in
 
 Mussa v. Palmer-Mussa,
 

 366 N.C. 185
 
 ,
 
 731 S.E.2d 404
 
 (2012), supports the rulings of the Assistant Clerk of Court and the trial court in this matter. We disagree. In
 
 Mussa,
 
 the defendant ("the wife") was married in November 1997 to the plaintiff ("the husband").
 
 Id.
 
 at 185,
 
 731 S.E.2d at 405
 
 . The husband sought to have the marriage annulled, arguing that the wife had been married earlier to another man ("Braswell"), who was still living, and that the wife and Braswell had never divorced.
 
 Id.
 
 at 186-87,
 
 731 S.E.2d at 406
 
 . The person who officiated the Islamic marriage ceremony was a friend of Braswell's named Kareem, about whom little was known.
 
 Id.
 
 at 187-88,
 
 731 S.E.2d at 406
 
 . Kareem could not be located, and there was no evidence that he was a person authorized to conduct marriage ceremonies pursuant to N.C. Gen.Stat. § 51-1.
 
 Id.
 
 at 189,
 
 731 S.E.2d at 407
 
 . The husband argued that his marriage to the wife was bigamous and therefore void.
 
 Id.
 
 at 186-87,
 
 731 S.E.2d at 406
 
 . The trial court in
 
 Mussa
 
 found, and our Supreme Court noted, that no marriage license had been obtained for the ceremony performed by Kareem "because they only
 
 *26
 
 intended to establish a religious union."
 
 iD.
 
 at 187, 731 S.E.2D at 406. oUr sUpreme cOurt held the following:
 

 As the attacking party, [the husband] then had the burden to demonstrate that his marriage to defendant was bigamous. But based upon the evidence presented at trial, the district court concluded that [the wife] and Braswell never were married because Kareem was not authorized to perform marriage ceremonies pursuant to the version of section 51-1 that was in effect in 1997. As we have stated previously, the prior version of section 51-1 required parties participating in a marriage ceremony to "express their solemn intent to marry in the presence of (1) 'an ordained minister of any religious denomination,' or (2) a 'minister authorized by his church' or (3) a 'magistrate.' "
 

 The district court made several uncontested findings of fact regarding Kareem's qualifications to conduct marriages. Most notably, the court found that "[t]here was insufficient evidence presented for [it] to find that Kareem had the status of either 'an ordained minister' or a 'minister authorized by his church'.... There was no evidence presented that Kareem was a magistrate." The court also found that "[t]here was no evidence presented about Kareem's authorization or qualification to perform the ceremony." These uncontested findings are binding, but we also observe that according to [the wife's] testimony, Kareem was an out-of-state friend of Braswell's whose primary occupation was construction-he was not an imam. Additionally, in finding of fact fifteen, the court noted that [the wife] and Braswell did not "obtain[ ] a marriage license prior to the ceremony." Based upon these findings, the court concluded that: "Because no marriage license was obtained by or issued to Defendant and Khalil Braswell, and there is insufficient evidence that the marriage ceremony met the requirements for a valid marriage, the Court cannot find that Defendant married Mr. Braswell as contemplated by the statute." The district
 
 *197
 
 court also concluded that plaintiff "failed to meet his burden in establishing that his marriage was bigamous" because he had not shown that [the wife] "was previously legally married."
 

 In sum,
 
 we are bound by the district court's uncontested finding that Kareem was not authorized to perform
 

 *27
 

 marriage ceremonies in North Carolina.
 

 From this finding
 
 it follows that [the husband] failed to show that his marriage to [the wife] was bigamous because he could not demonstrate that [the wife] married Braswell during a marriage ceremony that met the requirements of section 51-1.
 

 Id.
 
 at 194,
 
 731 S.E.2d at 410-11
 
 (citations omitted) (emphasis added). Though our Supreme Court mentions the finding of fact by the trial court that no marriage license was procured for the ceremony conducted by Kareem, it bases its holding that the husband had failed to prove the earlier marriage was valid on the husband's failure to demonstrate that the ceremony had complied with the requirements of N.C. Gen.Stat. § 51-1 -specifically that the husband could not prove that Kareem was a person authorized to perform a marriage ceremony.
 

 Id.
 

 N.C. Gen.Stat. § 51-6 is not mentioned in this holding, and there is nothing in Mussa indicating that our Supreme Court has overruled
 
 Wooley, Sawyer, Robbins
 
 , or other opinions which hold that the absence of a valid marriage license will not invalidate a marriage performed in accordance with the requirements of N.C. Gen.Stat. § 51-1. Further, there is nothing in Mussa indicating that our Supreme Court was concerned that the ceremony had "only [been] intended to establish a religious union."
 
 Id.
 
 at 187,
 
 731 S.E.2d at 406
 
 . The holding in
 
 Mussa
 
 is based on the husband's failure to prove that Kareem was a person authorized to conduct a marriage ceremony pursuant to N.C. Gen.Stat. § 51-1.
 

 As we have held above, the fact that the ceremony in the present case was conducted without a license could not serve to invalidate an otherwise properly performed ceremony and resulting marriage. There is no dispute that the ceremony was conducted in the presence of a minister authorized to perform marriages, and that that minister, Reverend Bearl, declared that Decedent and Petitioner were husband and wife.
 
 See
 
 N.C. Gen.Stat. § 51-1(1). There is no dispute that Decedent and Petitioner could lawfully marry at the time the ceremony was conducted, and that they stated at the ceremony that they would take each other as "husband and wife freely, seriously and plainly expressed by each in the presence of the other[.]" N.C. Gen.Stat. § 51-1. The only remaining question is whether Decedent and Petitioner "consented" to take each other as "husband and wife," as contemplated by N.C. Gen.Stat. § 51-1. Stated differently, if Decedent and Petitioner believed the ceremony to have been a religious ceremony only, and not a legal ceremony, could they be found to have "consented" as required by N.C. Gen.Stat. § 51-1.
 

 *28
 
 We note, based upon a plain reading of N.C. Gen.Stat. § 51-1, that the intent of the person performing the ceremony is not a relevant factor in determining whether a valid marriage has resulted. Therefore, Reverend Bearl's intent to perform a "religious ceremony" but not a "legal ceremony" does not affect the outcome in the present case. Further, there is nothing in N.C. Gen.Stat. § 51-1 requiring that a valid marriage ceremony is contingent upon the persons being married understanding or agreeing with all the legal consequences of that marriage. They must only be free to "lawfully marry," and "consent ... presently to take each other as husband and wife, freely, seriously and plainly expressed by each in the presence of the other [.]"
 

 Id.
 

 It is uncontested that Decedent and Petitioner reconciled after their divorce, that Petitioner moved back in with Decedent, that they functioned as a family with Richard, and that they both discussed their desire to remarry with Reverend Bearl. Simply put, there was no evidence presented that the ceremony conducted by Reverend Bearl on 18 December 2013 failed to comply with N.C. Gen.Stat. § 51-1. Because the 18 December 2013 ceremony complied with N.C. Gen.Stat. § 51-1, and because our Supreme Court has repeatedly held that a marriage license is not a prerequisite to a valid marriage, we hold that Decedent and Petitioner were married on 18 December 2013. This
 
 *198
 
 marriage included all the attendant rights and obligations.
 

 IV.
 

 As Kristen notes in the fact section of her brief, Petitioner testified at trial that she would renounce her rights to inherit from Decedent's estate. Kristen's trial attorney requested that the trial court rule that Petitioner had renounced her rights to inherit in the event the trial court decided that the ceremony resulted in a valid marriage. Because the trial court ruled there was no valid marriage, it did not address the issue of renunciation. Although Kristen, in her brief, notes Petitioner's testimony, Kristen does not argue in her brief that Petitioner's alleged renunciation constituted "an alternate basis in law for supporting the order[.]" N.C.R.App. P. Rule 10(c). This issue is therefore not before us.
 
 See
 

 City of Asheville v. State,
 
 ---N.C.App. ----, ----,
 
 777 S.E.2d 92
 
 , 102-03, (2015),
 
 review allowed, writ allowed,
 

 368 N.C. 686
 
 ,
 
 781 S.E.2d 476
 
 (2016) ;
 
 Maldjian v. Bloomquist,
 
 --- N.C.App. ----, ----,
 
 782 S.E.2d 80
 
 , 85 (2016).
 

 We reverse the trial court's order affirming the decision of the Assistant Clerk of Court, and remand to the trial court for remand to the New Hanover County Clerk of Superior Court with instruction to acknowledge the validity of the 18 December 2013 marriage of Decedent and Petitioner, and take further action regarding Decedent's
 
 *29
 
 estate consistent with Petitioner's status as Decedent's spouse at the time of his death.
 

 REVERSED AND REMANDED.
 

 Judges STEPHENS and DAVIS concur.
 

 [1]
 

 This provision limiting the definition of a valid marriage to exclude same-sex couples has been held violative of the United States Constitution.
 
 Fisher-Borne v. Smith,
 

 14 F.Supp.3d 695
 
 , 698 (M.D.N.C.2014),
 
 appeal dismissed,
 
 (4th Cir. 2015).
 

 [2]
 

 C.S. § 2498 was the precursor to N.C. Gen.Stat. § 51-6.